UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------X

UNITED STATES OF AMERICA

    - against -

THOMAS HAMPTON,

          Defendant.

-----------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/25/13

13 Cr. 301-01 (RWS)

SENTENCING OPINION

**Sweet, D.J.**


    On April 19, 2013, Thomas Hampton ("Hampton") pleaded guilty to the following charge: (i) Count One: commodities fraud, in violation of 7 U.S.C. §§ 60(1); 13(a)(1); and 13(a)(5); and 18 U.S.C. § 2.  For the reasons set forth below, Hampton will be sentenced to a term of sixty months' imprisonment to be followed by three years supervised release on Count One.  Defendant will forfeit to the United States any property constituting proceeds from the offense.  Defendant will also be required to pay a special assessment of $100.

1

**Prior Proceedings**

Information 13 CR 301 (RWS) was filed in the Southern District of New York on April 19, 2013.

Count One charges that from at least September 2010, up to and including September 2011, in the Southern District of New York and elsewhere, Hampton, a principal of Hampton Capital Markets, LLC ("Hampton Capital" or the "Fund"), while acting as a commodity pool operator, by the use of mail falsely represented to investors that the Fund's investment in Standard & Poor ("S&P") 500 E-mini futures, among other instruments, had increased in value, when in fact the Fund's investments had decreased in value.

On April 19, 2013, defendant Hampton appeared before the Honorable James C. Francis and allocated to his criminal conduct as charged in accordance with a plea agreement.

Hampton's sentencing is currently scheduled for September 26, 2013.

**The Sentencing Framework**

2

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the Advisory Guidelines. Thus, the sentence to be imposed here is the result of a consideration of:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed —

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for —

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

(5) any pertinent policy statement . . . [issued by the Sentencing Commission];

(6)   the   need   to   avoid   unwarranted   sentence
      disparities   among   defendants   with   similar
      records   who   have   been   found   guilty   of
      similar conduct; and

(7)   the need to provide restitution to any victims of
      the offense.

18 U.S.C. § 3553(a).   A sentencing judge is permitted to find

all the facts appropriate for determining a sentence, whether

that sentence is a so-called Guidelines sentence or not.   See

Crosby, 397 F.3d at 114-15.


**The Defendant**


         The   Court   adopts   the   facts   set   forth   in   the

Presentence   Investigation   Report   ("PSR")   with   respect   to

Hampton's personal and family history.


**The Offense Conduct**


         The following description draws from the PSR. The

specific facts of the underlying conduct are adopted as set

forth in that document.


         In 2007, Hampton created Hampton Capital, a limited

liability company incorporated in Arizona.   Hampton Capital was


4

a hedge fund that bought and sold exchange traded funds

("ETFs"), investment funds that hold assets such as stocks,

commodities or bonds.  ETFs typically track an underlying

benchmark or index, such as the S&P 500 equities market index.

In its offering memorandum, Hampton Capital purported to utilize

specially designed computer software to trade ETFs based on

pricing inefficiencies.  According to an Offering Memorandum

issued by Hampton Capital ("Offering Memorandum"), investors in

Hampton Capital had "the choice of either electing to receive a

10% annual return or participating in the profits generated by

the trading, receiving 50% of the profits on the amount

invested."  Investors could elect to receive the earned income

in monthly dividends or reinvest it in the Fund.


Hampton was the Managing Director of Hampton Capital.

Between September 2010 and September 2011, Hampton Capital had

more than $4 million under management.  During this time frame,

Hampton executed trades on behalf of Hampton Capital, and, as a

result of those trades, the Fund began suffering losses.  The

Fund began to lose money in December 2010, with particularly

heavy losses in May and June 2011.


Instead of disclosing these losses to investors,

Hampton hid them by falsely assuring investors that Hampton

Capital was performing well and falsely representing to investors that the value of Hampton Capital – and thus the value of their investments – had increased when, in fact, the Fund was losing money.  Hampton Capital provided monthly statements to its investors that summarized the performance of their investments.  These statements showed positive performance from Hampton Capital, despite the fact that the value of the Fund actually decreased in June, July and August 2011.  As a result of Hampton's material misrepresentations and omissions, investors in Hampton Capital did not seek to redeem or withdraw their investments, and some provided additional investment capital to Hampton Capital.

Below are two examples of fraud by Hampton:

Victim-1

Victim-1 met with Hampton in early 2011 to discuss investing with Hampton Capital.  At this meeting, Hampton described Hampton Capital's trading strategy in securities that traded on the Standard & Poor index.  Thereafter, on or about February 4, 2011, Victim-1 invested $50,000 to a Hampton Capital bank account at the Bank of America ("Hampton B of A Account").  In connection with Victim-1's investment, Victim-1 elected to

earn 50% of the profits on Victim-1's investment to have that
amount reinvested in the Fund on Victim-1's behalf.

Following Victim-1's initial investment in Hampton
Capital, and through August 2011, Victim-1 received monthly
statements from Hampton that summarized the performance of
Victim-1's investment.  All of the statements Victim-1 received
between March and August 2011 reflected monthly gains in Hampton
Capital and in Victim-1's investment.  Contrary to these
statements and unbeknownst to Victim-1, the value of the Fund
actually decreased in April, June and July 2011.

In reliance on the false statements by Hampton Capital
and Hampton personally about Hampton Capital's positive
performance, Victim-1 made an additional investment in Hampton
Capital in late August 2011.  On August 25, 2011, Victim-1
transferred an additional $50,000 in investment capital to the
Hampton Capital B of A Account.

In a statement dated September 1, 2011, which
summarized Victim-1's investment and reflected that Victim-1's
second capital contribution consisting of $50,000 would be
invested as of September 1, 2011, Victim-1 was advised that for
the month of August 2011, "Volatility was superb and the fund

returned 16.245% gross . . . giving a net split of 8.123%."
However, as a Special Agent of the New York Office of the FBI
calculated, the value of the Fund actually decreased by at least
48% in August 2011.  Victim-1 did not receive any statements
from Hampton Capital or Hampton after the September 1, 2011
statement.  Thereafter, Victim-1 unsuccessfully attempted to
contact Hampton and redeem his investment; Victim-1 has never
received any money from Hampton Capital.

Victim-2

        Victim-2 made an initial investment of $100,000 with
Hampton Capital on October 22, 2010.  In connection with Victim-
2's investment, Victim-2 elected to earn 50% of the profits on
Victim-2's investment and chose to have that amount re-invested
in the Fund on Victim-2's behalf.

        Following Victim-2's initial investment in Hampton
Capital and through April 2011, Victim-2 received monthly
statements from Hampton that summarized the performance of
Victim-2's investment and reflected the positive performance of
Hampton Capital for each of those months.  On April 27, 2011,
Victim-2 emailed Hampton that Victim-2 wanted to invest an
additional $100,000 with Hampton Capital.  By email response on

April 28, 2011, Hampton thanked Victim-2 for his additional investment and advised Victim-2 that "we're up nicely for the month (4%) and we plan to keep it up!"  This representation was false:  The value of the Fund decreased by at least 14% in April 2011.  Following receipt of this email, on April 29, 2011, Victim-2 transferred $100,000 to the Hampton B of A Account, bringing Victim-2's total capital contribution in the Fund to $200,000.

Following this second investment and through September 2011, Victim-2 continued to receive monthly statements form Hampton summarizing the performance of Victim 2's investment in Hampton Capital.  Unbeknownst to Victim-2, the value of the Fund actually decreased in June, July and August 2011.

On July 16, 2011, after reviewing the July 5, 2011 statement reflecting $357.98 in income for the month of June 2011, Victim-2 emailed Hampton: "why such [a] dismal return for [June] - $358 on $200,000?"  In an email response that same day, Hampton explained that "the S&P [Standard & Poor] was down 1.67% for June and we were up, with considerably less exposure . . . . Please note we are up nicely since inception (and have never had a down month) at a time when most big hedge funds are getting slaughtered . . . ."  Hampton's statements that the Fund was

9

"up" for June and had never been down were false.

On August 9, 2011, after reviewing his August 1, 2011 statement that reflected income on his investment for the month of July 2011 of $4,834.45, Victim-2 sent an email to Hampton stating: "Thanks for the July earnings statement. Nice increase in July earnings over June. Hope all is going well. Is August off to a strong start?" In an email response that same day, Hampton wrote: "July was decent but not great . . . August is shaping up to be great." This statement was false: the value of the fund decreased at least 26% in July.

Victim-2 did not receive any statements from Hampton Capital or Hampton after the September 1, 2011 statement. Thereafter, Victim-2 unsuccessfully attempted to contact Hampton and redeem his investment; Victim-2 has never received any money from Hampton Capital.

Hampton Capital Losses and Victim Impact

Upon receipt of investor money into the Hampton Capital B of A account, Hampton directed that the bulk of this money be transferred by wire to an Interactive Brokers custodial account located in New York, New York. The money was then

10

routed to specific accounts over which Hampton had signatory and trading authority and in which Hampton executed trades in securities and futures contracts on behalf of Hampton Capital (the "Hampton Capital Accounts").

Hampton was aware that in the course of executing trades for the Fund, Hampton lost money on behalf of the Fund. The total value of the Hampton Capital Accounts as of May 31, 2011 was less than 60% of the investment capital contributions to Hampton Capital since the start of the Fund.  However, all Hampton Capital statements provided to investors summarizing the activity through May 31, 2011 reflected a positive return on the Fund for each month, whereas, in actuality, the Fund suffered losses in certain months.

According to the Government, the offense involved more than 50 victims and Hampton caused a loss of more than $2,500,000, but less than $7,000,000.  The total restitution amount is $4,879,627.98.

**The Relevant Statutory Provisions**

For Count One, pursuant to 7 U.S.C. §§ 60(1), 13(a)(1) and 13(a)(5), and 18 U.S.C. § 2, the maximum term of

11

imprisonment is ten years.

For Count One, the maximum term of supervised release pursuant to 18 U.S.C. § 3583(b)(2) is three years if a term of imprisonment is imposed.

For Count One, the defendant is eligible for not less than one nor more than five years probation pursuant to 18 U.S.C. § 3561(c)(1).

For Count One, the maximum fine is $1,000,000 pursuant to 7 U.S.C. §§ 60(1), 13(a)(1) and 13(a)(5).  A special assessment of $100 is mandatory, pursuant to 18 U.S.C. § 3013.

Full restitution to the victims is required under 18 U.S.C. §3663A and 18 U.S.C. § 3664.  The list of victims/restitution information is appended to the final disclosure of the PSR.

As a result of committing the offense alleged in Count One of this Information, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (D), and 28 U.S.C. § 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable

12

to the commission of said offence.

**The Guidelines**

The November 1, 2012 edition of the United States Sentencing Commission Guidelines Manual has been used in this case for calculation purposes, pursuant to § 1B1.11(a).   The Court finds the following with respect to Defendant's applicable offense level, criminal history, recognition of responsibility, and term of imprisonment:

Count One charges the defendant with commodities fraud.  The guideline for a violation of 7 U.S.C. §§ 60(1), 13(a)(1) and 13(a)(5), and 18 U.S.C. § 2 is found in § 2B1.1. Because the defendant was convicted of an offense referenced to this guideline, the base offense level is six.  Because the loss resulting from the offense was more than $2,500,000 but less than $7,000,000, 18 levels are added pursuant to § 2B1.1(b)(1)(J).  Because the offense involved more than 50 victims, the base offense level is increased by four levels pursuant to § 2B1.1(b)(2)(B).  The defendant abused his position of private trust and used a special skill in a manner that significantly facilitated the commission and concealment of the offense.  As such, the base offense level is increased by 2

13

levels, pursuant to § 3B1.3.

Based on the defendant's plea allocution, the
defendant has shown recognition of responsibility for the
offense.  Pursuant to § 3E1.1(a), the offense is reduced three
levels.

According to the PSR, the total offense level is 27.

The defendant has several previous unrelated criminal
convictions.  The defendant has three criminal history points
and a Criminal History Category of II.

Based on a total offense level of 27 and a Criminal
History Category of II, the Guidelines range for imprisonment is
78 to 97 months.

The Guideline range for a term of supervised release
for Count One is at least one year but not more than three
years, pursuant to §5D1.2(a)(2).

Because the applicable guideline range is in Zone D of
the  Sentencing  Table,  the  Defendant  is  not  eligible  for
probation, pursuant to §5B1.1, Application Note #2.

14

Under the Guidelines, the fine range for the instant offense is from $12,500 to $1,000,000 pursuant to §5E1.2(c)(3)(A) and (c)(4). Subject to the defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation or supervised release pursuant to §5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,412.33 to be used for imprisonment, a monthly cost of $278.95 for supervision and a monthly cost of $2,244.17 for community confinement.

Pursuant to 5E1.1(a)(1), in case of an identifiable victim, the Court shall enter a restitution order for the full amount of the victim's loss if such order is authorized under 18 U.S.C. § 3663A. Full restitution to the victim is required under 18 U.S.C. § 3663A and 18 U.S.C. § 3664. As per the written plea agreement, the defendant agrees to make restitution in an amount determined by the Court. The list of victims/restitution information is appended to the final disclosure of the PSR and hereby adopted by the Court.

Pursuant to Rule 32.2, "[t]he Court must include the forfeiture when orally announcing the sentence or must otherwise

15

ensure that the Defendant knows of the forfeiture at sentencing.
The Court must also include the forfeiture order, directly or by
reference, in the judgment."

## The Remaining Factors of 18 U.S.C. § 3553(a)

Having engaged in the Guidelines analysis, this Court
also gives due consideration to the remaining factors identified
in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not
greater than necessary," as is required by the Supreme Court's
decision in Booker, 543 U.S. 220, and the Second Circuit's
decision in Crosby, 397 F.3d 103.  In light of the Court's
statutory responsibility "to 'impose a sentence sufficient, but
not greater than necessary' to accomplish the goals of
sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007)
(quoting 18 U.S.C. § 3553(a)), and having considered the
Guidelines and all of the factors set forth in § 3553(a), it is
determined that a Guidelines sentence is not warranted in the
instant case.

Under 18 U.S.C. § 3553(a)(1), the Court considers "the
nature and circumstances of the offense and the history and
characteristics of the defendant."  Pursuant to 18 U.S.C.
§ 3553(2)(A), the Court weighs the need for the sentence imposed

16

to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense.

The defendant's immediate cooperation when approached by the Government, his showing of remorse for his acts, his motivation for conducting the offense (to recover losses suffered by the Fund), the difficulties the offense has caused on the defendant's personal life (Hampton is currently estranged from his wife and unemployed) and efforts that demonstrate his commitment to self-improvement are considerations to be taken into account.  Although the defendant does have a criminal history, his prior offenses took place over 17 years ago and appear to be related to his abuse of alcohol.  Defendant also has a history of alcoholism, dating back to 1993, but has stopped drinking and currently attends Alcoholics Anonymous meetings.

Taken into account all of the above, a downward departure from the Guidelines sentence is warranted.

## The Sentence

For the instant offense, Hampton will be sentenced to 60 months' imprisonment and 36 months' supervised release.

17

As mandatory conditions of his supervised release, Defendant shall:

(1) Not commit another federal, state or local crime;

(2) Not illegally possess a controlled substance;

(3) Not possess a firearm or destructive device;

(4) Refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug testing within fifteen (15) days of placement on probation or supervised release and at least two unscheduled drug tests thereafter, as directed by the probation officer; and

(5) Cooperate in the collection of DNA as directed by the probation officer.

Furthermore, the standard conditions of supervision (1-13), shall be imposed with the additional special conditions:

(1)  The defendant shall not incur new credit charges or open additional lines of credit without the approval of the

18

probation officer unless the defendant is in compliance with the installment payment schedule.

(2)   The defendant shall provide the probation officer with access to any requested financial information.

(3)   The defendant shall participate in an alcohol aftercare treatment program under a co-payment plan, which may include testing via breathalyser at the direction and discretion of the probation officer.

(4)   The defendant shall submit his person, residence, place of business, vehicle or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found.  The search must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation. The defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

The defendant shall be supervised by the district of residence.

19

A special assessment of $100 is mandatory, pursuant to 18 U.S.C. § 3013.

Because the Defendant has no assets, no fine is imposed.

The defendant shall make restitution payable to the Clerk, U.S. District Court, for disbursement to the victims identified by the Government, in amount of $4,879,627.98. If the defendant is engaged in a BOP non-UNICOR work program, the defendant shall pay $25 per quarter toward the criminal financial penalties. However, if the defendant participates in the BOP's UNICOR program as a grade 1 through 4, the defendant shall pay 50% of his monthly UNICOR earnings toward the criminal financial penalties, consistent with BOP regulations at 28 C.F.R. § 545.11. Any payment made that is not payment in full shall be divided proportionately among the persons named.

The restitution shall be paid in monthly installments of 15% of gross monthly income over a period of supervision to commence 30 days after the date of the judgment or the release from custody if imprisonment is imposed.

The defendant shall notify the United States Attorney

for this district within 30 days of any change of mailing or residence address that occurs while any portion of the restitution remains unpaid.

As a result of committing the offense alleged in Count One, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (D), and 28 U.S.C. § 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense.

The defendant is viewed as a good candidate for voluntary surrender. He has kept all court appearances and has been in compliance with all terms and conditions of his pretrial release. He is not viewed as a flight risk or a danger to the community.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for September 26, 2013.

It is so ordered.

New York, NY
September   25, 2013

ROBERT W. SWEET
U.S.D.J.

21